IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

BRIAN POOLE                                            PLAINTIFF


        v.                        CIVIL NO. 10-3037


MICHAEL J. ASTRUE, Commissioner
Social Security Administration                         DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Brian Poole, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of the Social Security Administration (Commissioner)

denying his claims for period of disability and disability insurance benefits (DIB) and

supplemental security income (SSI) benefits under the provisions of Titles II and XVI of the

Social Security Act (Act).  In this judicial review, the Court must determine whether there is

substantial evidence in the administrative record to support the Commissioner's decision.  See

42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff protectively filed his current applications for DIB and SSI on December 8, 2006,

alleging an inability to work since April 28, 2006, due to sleep apnea, a right shoulder problem,

a right testicle problem, a hernia problem, a back impairment, depression, anxiety, and obesity.

(Tr. 97-99; Doc. 8, p.2).  Plaintiff's applications were denied initially on February 15, 2007, and

upon reconsideration on May 3, 2007.  (Tr. 51).  Thereafter, Plaintiff filed a timely written

request for a hearing on May 23, 2007.  An administrative hearing was held on June 5, 2008, at which Plaintiff's counsel appeared and a vocational expert testified.[1]  (Tr. 15-43).

By written decision dated September 26, 2008, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 53).  Specifically, the ALJ found Plaintiff had the following severe impairments: a right supraspinatus tear and obesity.  However, after reviewing all of the evidence presented, she determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Tr. 54).  The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that while the claimant can frequently lift and/or carry less than ten pounds, sit (with normal breaks) for a total of about six hours in an eight hour work day, and stand and/or walk (with normal breaks) for a total of at least two hours in an eight hour work day, he cannot climb scaffolds, ladders, or ropes, and he cannot operate motor vehicles as part of his work.  The claimant should not be exposed to unprotected height or dangerous equipment/machinery.  The claimant can only occasionally reach overhead with his dominant right hand and he can only occasionally climb ramps and stairs, stoop, bend, crawl, kneel, or balance.  The claimant must work where instructions are simple and non-complex; interpersonal contact with co-workers and the public is superficial and incidental to the work performed; the complexity of tasks is learned and performed by rote; the work is routine and repetitive; there are few variables; little judgment is required; and the supervision required is simple, direct, and concrete.

(Tr. 54-55). With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a bench hand assembler, a call out operator/general office clerk, and a surveillance system monitor.  (Tr. 59).

---

[1] The record reflects that Plaintiff was unable to attend the hearing due to his incarceration.  In a letter dated July 10, 2008, Plaintiff's counsel submitted a cover letter along with a letter from Plaintiff indicating that Plaintiff waived his right to a hearing and would allow a decision on his claim to be made based on the evidence of record.  (Tr. 93-94).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on March 12, 2010. (Tr. 4-7). Subsequently, Plaintiff filed this action. (Doc. 1). This case is before the undersigned pursuant to the consent of the parties. (Doc. 5). Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 8,11).

## II.   Evidence Presented:

At the time of the administrative hearing before the ALJ on June 5, 2008, Plaintiff was thirty-eight years of age and obtained a general equivalency diploma. (Tr. 21). As noted above, Plaintiff waived his right to be present at the administrative hearing. (Tr. 93-94). The record reflects Plaintiff's past relevant work consists of work as a freight truck hauler, and a concrete truck driver. (Tr. 25-26).

The pertinent medical evidence in this case reflects the following. On May 28, 2006, Plaintiff entered the North Arkansas Medical Center emergency room complaining of neck pain and that his umbilicus had "popped out." (Tr. 183-192). Plaintiff reported he smoked two packages of cigarettes a day. Ms. Betty Reynolds, RN, noted that Plaintiff had no emotional, spiritual, or cognitive needs. Dr. Barbara Ashe, the examining physician, noted that Plaintiff reported that his umbilicus "popped' out earlier in the day and that he was experiencing excruciating pain. Dr. Ashe noted the hernia was reduced but the pain persisted. Dr. Ashe noted Plaintiff also complained of right shoulder pain for one month.

Upon examination, Dr. Ashe noted Plaintiff had unlabored respirations with good breath sounds; and that Plaintiff's heart had a regular rate with no significant murmurs, rubs, or gallop. Plaintiff's abdomen was noted as non-distended and not excessively obese. Dr. Ashe observed a medium sized severely tender umbilical hernia. Dr. Ashe noted Plaintiff had no pain with joint

AO72A
(Rev. 8/82)

movement affecting the right shoulder and scapula, and was not tender to palpation over the right shoulder and scapula.  Dr. Ashe noted that there was some mild swelling of the shoulder and scapula but no significant decreased range of motion.  Dr. Ashe recommended Plaintiff see an orthopedist for his shoulder problems.  Dr. Ashe diagnosed Plaintiff with an incidental umbilical hernia, shoulder sprain and abdominal pain.  Plaintiff was discharged with instructions to follow-up if the pain did not go away.

From May 5, 2006, through June 2, 2006, Plaintiff was treated by Dr. Anthony Burton for right testicular pain.  (Tr. 202-204).  Plaintiff's continued complaints of pain led Dr. Burton to schedule a hernia repair on June 5th.

On May 31, 2006, Plaintiff was seen by  Dr. Orlando Aguilar-Guzman, upon referral of Dr. Burton, for his right testicular pain.  (Tr. 211-212).  Plaintiff reported when he did any physical activity, even climbing in and out of his car or picking up his child, he had a recurrence of pain.  Dr. Aguilar-Guzman noted that Plaintiff worked in construction doing strenuous physical activity; that he drank a twelve pack of beer weekly and two liters of Mountain Dew daily; and that he smoked two packages of cigarettes a day.  After examining Plaintiff,  Dr. Aguilar-Guzman's impression stated the following:

> These findings discussed with patient. Chronic epididymitis[2] which unfortunately is exacerbated by physical activity and also is having sever (sic) shoulder pain. I have asked him to talk to Dr. Burton about referral to an orthopedic surgeon for further evaluation.  Discussed importance of restriction of physical activity.

---

[2]Epididymitis is defined as an inflammation of the epididymis. Dorland's Illustrated Medical Dictionary at 638, 31st Edition (2007).  The epididymis is defined as the elongated cordlike structure along the posterior border of the testis, whose elongated coiled duct provides for storage, transit, and maturation of spermatozoa and is continuous with the ductus deferens. Id.

AO72A
(Rev. 8/82)

(Tr. 212). Dr. Aguilar-Guzman started Plaintiff on Ibuprofen and re-filled a Vicodin prescription for thirty tablets. Dr. Aguilar-Guzman wrote a note for work that Plaintiff "may not return to work since he cannot do any light duty at work until further notice." Plaintiff was to return to see Dr. Aguilar-Guzman in two weeks.

On June 5, 2006, Plaintiff was admitted into the Washington Regional Medical Center to undergo an outpatient procedure. (Tr. 193-201). Plaintiff complained of belly button pain and right groin pain. Dr. Burton noted Plaintiff had been referred to him by Dr. Sam Price due to Plaintiff's right testicular pain. Plaintiff reported that he noticed the pain while working. Dr. Burton noted that Plaintiff smoked a couple of packages of cigarettes a day. Dr. Burton also noted that Plaintiff had seen Dr. Aguilar-Guzman, a urologist, who did not think Plaintiff had epididymitis or any serious problem that would require surgery or antibiotics. After examining Plaintiff, Dr. Burton recommended that Plaintiff undergo an open repair of an umbilical hernia with mesh which was performed on June 5th.

On June 12, 2006, Dr. Burton noted that Plaintiff was doing well. (Tr. 202). Plaintiff was instructed not to lift over twenty pounds. By June 26th, Dr. Burton noted that Plaintiff's umbilical hernia had healed nicely. (Tr. 202). Plaintiff continued to complain of some right groin pain, and after an examination, Dr. Burton noted that Plaintiff did not have a hernia. Plaintiff was instructed to return as needed.

On June 16, 2006, Plaintiff reported a worsening of his testicular pain. (Tr. 210). Plaintiff reported he was better when he was taking Celebrex. Plaintiff reported he continued to take Vicodin and Soma for his arm and testicular pain. Plaintiff also reported a decreased libido and decreased sexual function which Dr. Aguilar-Guzman attributed to the narcotics. Dr.

-5-

Aguilar-Guzman recommended that Plaintiff continue to restrict his physical activities, including intercourse. Plaintiff was started on Celebrex and instructed to return in one month for a follow-up appointment.

On June 27, 2006, Dr. Ledbetter noted Plaintiff was in his office for a "workman's comp" injury sustained while working for Brundege Bone. (Tr. 206). Dr. Ledbetter noted Plaintiff was seeing him for his right shoulder pain. Plaintiff reported he was pouring cement at the new mall and experienced an onset of umbilical pain, testicle pain, and pain in the right shoulder. Plaintiff reported he went to the Medi-Serve Clinic and was found to have an umbilical hernia, a testicle abnormality and a right shoulder abnormality. Dr. Ledbetter noted Plaintiff subsequently underwent a repair of his umbilical hernia. Plaintiff reported he was currently under the care of Dr. Aguilar-Guzman for his testicle. Upon examination of the shoulder, Dr. Ledbetter noted Plaintiff had weakness to abduction and could not hold his arm up in abduction to the side against gravity. Dr. Ledbetter recommended Plaintiff get a MRI of the shoulder. Dr. Ledbetter's impression stated "rule out rotator cuff tear." A clinic notation dated July 7, 2006, reported an appointment for the MRI would have to be in Branson or Springfield, and that Plaintiff would then call for a follow-up appointment. (Tr. 206).

On July 14, 2006, Plaintiff underwent a MRI of the right shoulder that revealed the following:

> 1. Small incomplete full thickness anterior tear of the supraspinatus tendon with underlying osteochondral defect. This injury may be result of a direct blow.
> 2. Mild medial and lateral canal stenosis
> 3. Adhesive capsulitis
> 4. Saline distention or arthrography may be clinically indicated.
> 5. Additional positive and negative findings are noted above.

-6-

(Tr. 207-208).

On July 17, 2006, Plaintiff reported no improvement. (Tr. 210). Dr. Aguilar-Guzman noted Plaintiff still had some mild induration in the upper pole of the epididymis on the right side. Plaintiff was started on Elavil and his Vicodin prescription of thirty tablets was re-filled. Plaintiff was to return in one month.

On July 18, 2006, Plaintiff returned to Dr. Ledbetter's office to receive his MRI results. (Tr. 205). Dr. Ledbetter indicated that Plaintiff would need to undergo physical therapy to break loose adhesive capsulitis and to establish a good range of motion without pain. If Plaintiff continued to have symptoms, Dr. Ledbetter indicated that would warrant an arthrogram. Dr. Ledbetter noted that if physical therapy took care of the problem, then the arthrogram would not be warranted.

On August 1, 2006, Dr. Ledbetter noted that he had received a note from Harrison Physical Therapy that Plaintiff did not show up for his therapy. (Tr. 205). Plaintiff did not show up for his scheduled appointment with Dr. Ledbetter on August 15th.

On August 25, 2006, Plaintiff reported that he failed to notice any improvement in spite of treatment with rest. (Tr. 209). Plaintiff was still not working. Plaintiff reported that the Elavil had not helped, and that it had made him very drowsy which impacted his ability to take care of his children. Upon examination, Dr. Aguilar-Guzman observed mild epididymal induration on the right side with tenderness on palpation. Dr. Aguilar-Guzman's impression stated the following:

> Chronic epididymitis unresponsive to conservative measures. May need to consider epididymectomy, but I feel that even after epididymectomy patient will continue to have pain. This likely has evolved into a chronic pain syndrome.

-7-

(Tr. 209). Dr. Aguilar-Guzman stated he had exhausted what he could do for Plaintiff and instructed Plaintiff to obtain a second opinion. Dr. Aguilar-Guzman provided Plaintiff with a list of names and telephone numbers to other urologists in the area.

On October 10, 2006, Plaintiff was seen by Dr. Rolland Lee Bailey. (Tr. 226). Plaintiff complained of whole body cramps, constant wheezing and hacking, chronic epiditimitic (sic), and constant heartburn. Plaintiff also reported that he stopped breathing when he was asleep. Dr. Bailey noted that Plaintiff was not on any on-going medications. Dr. Bailey scheduled Plaintiff to undergo a sleep study and prescribed medication.

On November 7, 2006, Plaintiff underwent an overnight polysomnogram without CPAP titration performed by Dr. Mohammad Al-Ajam. (Tr. 272-279). After reviewing the results, Dr. Al-Ajam opined that Plaintiff was likely to suffer from mild obstructive sleep apnea and recommended the following:

> 1. A CPAP titration sleep study.
> 2. Maximize effort of weight reduction in this patient with a body mass index of 40.2.
> 3. Avoid sedatives and alcohol use.
> 4. Patient is advised to refrain from operative [sic] heavy machinery until CPAP titration and therapy are instituted because he is at risk of injury.
> 5. Thyroid function tests if clinically indicated.
> 6. Patient is advised to sleep on his side in the lateral position rather than in the supine position because most of his apneas and hypopneas occurred in the supine position until a CPAP titration and therapy are instituted.

(Tr. 272-276).

On November 12, 2006, Dr. Bailey's office notes indicated that the sleep study revealed Plaintiff had sleep apnea. (Tr. 225). These notes further indicated Plaintiff would need to undergo a second sleep study with a CPAP.

-8-

On January 9, 2007, Plaintiff underwent a consultative neuropsychological evaluation performed by Dr. Vann Arthur Smith. (Tr. 213-216). Dr. Smith noted that the clinical history was obtained from the Plaintiff and was considered, and that Plaintiff's medical records had been requested. Plaintiff described his overall health status as "poor" and noted a positive history of hypertension (untreated); chronic airway disease (emphysema); degenerative joint disease (shoulder, spine, weight bearing joints); cardiac disease (reportedly a MI in1992); sleep apnea; and multiple closed head injuries. Plaintiff reported he was positive for psychiatric attention for marriage counseling. Upon evaluation, Dr. Smith noted Plaintiff's memory was impaired and his judgment and insight were grossly intact. Dr. Smith noted that Plaintiff's narratives were non-fluent "with occasional audiblized word finding pauses." Dr. Smith opined Plaintiff's native intelligence was within the normal range. Dr. Smith diagnosed Plaintiff with cognitive dysfunction, non-psychotic, secondary to a general medical condition, and opined Plaintiff was disabled. Dr. Smith recommended "ongoing monitoring by Cardiology, Pulmonology and Rheumatology in addition to a referral to and follow up by a qualified Physiatrist with experience in the management of Chronic Pain Syndrome and the sequelae of TBI."

Dr. Smith also completed a mental RFC questionnaire opining Plaintiff's current global assessment of functioning score was 30-35, and his highest was 65. (Tr. 217-221). Dr. Smith opined Plaintiff's prognosis was guarded. Dr. Smith noted Plaintiff's signs and symptoms were as follows:

Blunt, flat or inappropriate affect; mood disturbance; difficulty thinking and concentrating; psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional

-9-

abilities; emotional lability; easy distractibility; memory impairment-short, intermediate or long term; and sleep disturbance.

(Tr. 218).  Dr. Smith opined Plaintiff was seriously limited, but not precluded or unable to meet competitive standards in twenty-five of twenty-five areas of functioning.  Dr. Smith further opined Plaintiff would miss more than four days per month due to his impairments.

On January 14, 2007, Plaintiff underwent a sleep study with the use of a CPAP.  (Tr. 267-270).  In a letter dated January 23, 2007, Dr. Rolland L. Bailey stated the following about Plaintiff:

> He has been documented as having sleep apnea, morbid obesity with a BMI of 40...He does have problems with breathing, depression and other problems which are secondary to the two primary problems of sleep apnea and morbid obesity with daytime hypersomnolence.  The morbid obesity has led to his back problems.  I do not have documentation of his emphysema; however he does have COPD and is on chronic bronchodilators.  I do not have any documentation about the depression nor hypertension.

(Tr. 222).

On February 5, 2007, Plaintiff underwent a chest x-ray which revealed a possible small bleb[3] laterally in the right chest, which was noted as possible scarring.  (Tr. 264).  Plaintiff also underwent a lumbar spine x-ray that revealed a likely transitional vertebra; and otherwise body heights, disk spaces, and curvature were maintained.  (Tr. 265).

On February 12, 2007, Dr. Brad F. Williams, a non-examining medical consultant, completed a psychiatric review technique form indicating Plaintiff had no restrictions of his activities of daily living; no difficulties in maintaining social functioning; no deficiencies of

---

[3]Bleb is defined as a bulla which is defined as a large blister.  See Dorland's Illustrated Medical Dictionary at 228, 263, 31st Edition (2007).

-10-

concentration persistence or pace; and had no episodes of decompensation. (Tr. 230-243). Dr.

Williams' notes indicated the following:

> Allegations: back problems, emphysema, depression, right shoulder problem,
> stomach problems, hypertension, and hernia surgery
> Pain/Date:
> ADLs/Date: did not return forms
>
> Orienting Paragraph: 37 yo injured on job w/partial thickness supraspinatuous
> tear, DNKA for PT and did not follow up w/orthopedist. s/p umbilical hernia
> repair in 6/06, well healed. Tx by urologist for testicular pain, mild epididymal
> induration on R side w/TTP. UA nl. Md notes likely has evolved into chronic
> pain syndrome, may not respond to epididymectomy. given names for second
> opinion and dismissed from service. Absolutely NO indication in longitudinal
> MER from various sources regarding any MH impairments, but attny submits
> neuropsych eval that notes some sort of cognitive impairment due to general
> medical condition. WAIS is noted V 95, P 98, FS 96 but notes word finding
> difficulty and impaired memory.
>
> 1/9/07 neuropsych from attny: reports impaired memory recall, attn to detail,
> affective lability, work finding diff, episodic impulse dyscontrol, frequent deja-vu
> episodes, dysexecutivism. Hx marriage counseling. Ox3. judgement/insight
> grossly intact. impaired memory w/ 1:3 at 3. occ word finding pauses. no s/h.
> appropriate eye contact. IQ nl. TP functional to concrete. ASNSE 36/48. WAIS
> III-V 95, P 98, FS 96. Multiple other testing noted which, in examiners opinion,
> renders clmt disabled. Dx: cognitive dysfunction, non-psychotic, 2° to general
> med condition.
>
> Recommend semi-skilled RFC. MSS of "disabled" not supported by objective
> findings.

(Tr. 242.).

On the same date, Dr. Williams completed a mental RFC assessment stating Plaintiff had

moderate limitations in the following areas: the ability to maintain attention and concentration

for extended periods; the ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods; the ability to accept instructions and respond

appropriately to criticism from supervisors; and the ability to set realistic goals or make plans independently of others. (Tr. 244-247). Dr. Williams concluded that Plaintiff "is able to perform work where interpersonal contact is routine but superficial, e.g. grocery checker; complexity of tasks is learned by experience, several variables, uses judgment with limits; supervision required is little for routine but detailed for non-routine." On May 2, 2007, after reviewing the record, Dr. Jerry R. Henderson affirmed Dr. Williams' February 12, 2007 assessment. (Tr. 291).

On February 12, 2007, Dr. Ronald Crow, a non-examining medical consultant, completed a RFC assessment stating that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and could push or pull unlimited, other than as shown for lift and/or carry. (Tr. 250-257). Dr. Crow opined Plaintiff was limited in his ability to reach in all directions in that Plaintiff could only occasionally overhead reach on the right, but had no limitations in handling, fingering or feeling. Dr. Crow noted that postural, visual, communicative or environmental limitations were not evident. Dr. Crow made the following additional comments:

> 37 yo injured on job w/partial thickness supraspinatuous tear. DNKA for PT and did not follow up w/ orthopedist. s/p umbilical hernia repair in 6/06, well healed. Tx by urologist for testicular pain, mild epididymal induration on R side w/TTP. UA nl. MN notes likely has evolved into chronic pain syndrome, may not respond to epididymectomy. given names for second opinion and dismissed from service.
>
> Did not return pain/function forms
>
> RFC for light w/occasional overhead on R.

(Tr. 257).

-12-

On March 12, 2007, a New Patient clinic note reported Plaintiff was seen by Dr. Cyril A. Raben. (Tr. 258-261). Plaintiff complained of low back pain and right leg pain. Plaintiff reported he had sustained a lifting and twisting injury which had forced him out of work. Plaintiff reported that a physician had suggested that he obtain physical therapy and pain management, but he had been unable to do this because he had been denied the ability to obtain a MRI. Plaintiff reported his pain was exacerbated with normal activities and was alleviated with alcohol and pain pills. Plaintiff reported that he smoked two packages of cigarettes a day.

Upon examination, Dr. Raben noted Plaintiff was well appearing, well nourished, and oriented times three with a normal mood and affect. Dr. Raben noted Plaintiff had a normal gait and found no misalignment, asymmetry, crepitation, defects, tenderness, masses, effusions, decreased range of motion, instability, atrophy or abnormal strength or tone in the head, neck, spine, ribs, pelvis or upper and lower extremities. With regard to the spine, ribs and pelvis, Dr. Raben also noted "marked reduction range of motion pain and tenderness on palpation." Neurologically, Dr. Raben noted Plaintiff's sensation to pain, touch, and proprioception was normal; that Plaintiff's deep tendon reflexes were normal in both the upper and lower extremities; and that Plaintiff had no pathologic reflexes. Dr. Raben diagnosed Plaintiff with lumbar spine disc degeneration, lumbar spine pain, and lumbar spine radiculitis. Dr. Raben recommended Plaintiff undergo a MRI of the lumbar spine and prescribed Soma and Ibuprofen. Plaintiff was to follow-up with Dr. Raben once the studies were completed.

On March 23, 2007, Plaintiff underwent a MRI of the lumbar spine that revealed the following:

-13-

1. L4-L5 and L2-L3 herniated nucleus pulposus, as discussed above.  The L4-L5 level is eccentric to the left.  At the L2-L3 level, this is eccentric to the right.  The one at the L2-L3 level is slightly larger than at the L4-L5 level.
2. No compression fractures are noted.

(Tr. 262-263)

On April 25, 2007, Dr. Bill F. Payne, a non-examining medical consultant, completed a RFC assessment stating that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and could push or pull unlimited, other than as shown for lift and/or carry.[4] (Tr. 277-284).  Dr. Payne opined Plaintiff could occasionally stoop and crouch; and frequently climb, balance, kneel, and crawl.  Dr. Payne opined Plaintiff could frequently handle, finger, and feel; and could reach in all directions with the exception of only occasionally reaching overhead on the right.  Dr. Payne  noted that visual, communicative or environmental limitations were not evident.

**III.    Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists

---

[4]The medical record reviewed by Dr. Payne included the examination by Dr. Raben, as well as, the MRI of the lumbar spine.  (Tr. 284).

in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §§ 404.1520, 416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work

-15-

experience in light of his residual functional capacity.  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. §§ 404.1520, 416.920.

## IV.   Discussion:

Plaintiff contends that the ALJ erred in concluding that the Plaintiff was not disabled. Defendant argues substantial evidence supports the ALJ's determination.

### A.      Subjective Complaints and Credibility Analysis:

We first address the ALJ's assessment of Plaintiff's subjective complaints.  The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to:  (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly evaluated Plaintiff's subjective complaints.  Although Plaintiff contends that his impairments were disabling, the evidence of record does not support this conclusion.

With regard to Plaintiff's sleep apnea, the ALJ noted that Plaintiff underwent a sleep study in November of 2006, which revealed Plaintiff had mild obstructive sleep apnea.  Plaintiff

-16-

then underwent a sleep study with a CPAP in January of 2007.  Although Plaintiff was diagnosed

with sleep apnea, the ALJ found, and the record supports, in that Plaintiff no longer complained

of sleep apnea symptoms after starting to use the CPAP, that Plaintiff's sleep apnea was resolved

with the use of the CPAP machine.  Specifically, the Court would point out that Plaintiff failed

to report any problems due to his sleep apnea when he saw Dr. Raben in March of 2007 for a

new patient appointment.  Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009), quoting from

Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by

treatment or medication, it cannot be considered disabling.").  Due to the fact that Plaintiff's

sleep apnea was treated with the CPAP machine successfully, the ALJ found that Plaintiff's sleep

apnea had no more than a minimal effect on Plaintiff's physical and mental ability to do basic

work activities and was therefore a non-severe impairment.  Kirby v. Astrue, 500 F.3d 705, 707

(8th Cir.2007) (impairment is not severe if it is only slight abnormality that would not

significantly limit mental ability to do basic work activities).  The Court finds substantial

evidence to support this conclusion.

     With regard to Plaintiff's right shoulder pain, the ALJ noted that Plaintiff underwent a

MRI of the shoulder in July of 2006, which revealed an incomplete tear of the supraspinatus

tendon with an underlying osteochondral defect.  The medical evidence revealed that Dr.

Ledbetter recommended Plaintiff first undergo physical therapy, but suggested that if therapy did

not resolve the problem, an arthrogram would be warranted.  On August 1, 2006, Dr. Ledbetter

noted that Harrison Physical Therapy had informed him that Plaintiff did not show up for his

therapy as prescribed.  The evidence further revealed that Plaintiff failed to return for his August

15, 2006 scheduled appointment with Dr. Ledbetter.  It is noteworthy that in March of 2007,

-17-

when he was seen by Dr. Raben, an orthopaedic specialist, Plaintiff failed to mention right shoulder pain. Based on the evidence of record, the Court finds substantial evidence supports the ALJ's determination that Plaintiff does not have a disabling shoulder impairment.

With regard to Plaintiff's testicular pain and hernia problem, the medical evidence revealed that Plaintiff sought emergency room treatment for testicular pain and a potential hernia in May of 2006, after lifting something at work. Plaintiff subsequently underwent a hernia repair on June 5, 2006, without complications. Plaintiff's continued complaints of testicular pain resulted in a referral from Dr. Burton to Dr. Aguilar-Guzman, a urologist, who diagnosed Plaintiff with chronic epididymitis. Dr. Aguilar-Guzman recommended Plaintiff refrain from physical activity for two weeks, and prescribed Ibuprofen and thirty Vicodin tablets. The record reveals that Plaintiff complained of continued testicular pain to Dr. Aguilar-Guzman on June 16, 2006, July 17, 2006, and August 25, 2006. On August 25th, Dr. Aguilar-Guzman diagnosed Plaintiff with "chronic epididymitis unresponsive to conservative measures. May need to consider epididymectomy, but I feel that even after epididymectomy patient will continue to have pain. This likely has evolved into a chronic pain syndrome." Dr. Aguilar-Guzman further stated that he had exhausted what he could do for Plaintiff, and provided Plaintiff a list of names, numbers and addresses, so that Plaintiff could obtain a second opinion. The ALJ noted that the medical evidence failed to show Plaintiff sought a second opinion from another physician regarding his testicular pain. See Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995) (per curiam) (failure to seek treatment inconsistent with allegations of pain). Furthermore, in a letter dated January 23, 2007, Dr. Bailey, one of Plaintiff's physician's, did not indicate that Plaintiff continued to have testicular pain or a hernia problem. Based on the evidence of record, the

AO72A
(Rev. 8/82)

Court finds substantial evidence to support the ALJ's determination that Plaintiff does not have disabling testicle or hernia impairments.

With regard to Plaintiff's back pain, the medical evidence revealed that Plaintiff complained of back pain to Dr. Raben in March of 2007. The ALJ noted that after examining Plaintiff, Dr. Raben diagnosed Plaintiff with lumbar spine disc degeneration, lumbar pain, and lumbar radiculitis. Per Dr. Raben's recommendation, Plaintiff underwent a lumbar spine MRI on March 23, 2007, which revealed L4-L5 and L2-L3 herniated nucleus pulposus with the L4-L5 eccentric to the left and smaller than the L2-L3 which was eccentric to the right. No compression fractures were noted. Dr. Raben's treatment notes indicated Plaintiff was to have a follow-up appointment after the MRI was completed, but the record failed to show that Plaintiff was seen by Dr. Raben or any physician for his back pain after March of 2007. Thus, while Plaintiff may indeed experience some degree of pain due to his back impairment, the Court finds substantial evidence of record supporting the ALJ's finding that Plaintiff's back impairment was not disabling. See Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997) (upholding ALJ's determination that claimant was not disabled even though she had in fact sustained a back injury and suffered some degree of pain); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).

As for Plaintiff's alleged depression and anxiety, there is no medical evidence of record revealing that Plaintiff sought on-going and consistent treatment for his alleged depression and anxiety during the relevant time period. See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression

-19-

weighs against plaintiff's claim of disability).  The record reveals Plaintiff did undergo a consultative neuropsychological evaluation performed by Dr. Smith in January of 2007. However, at that time, Plaintiff did not allege depression or anxiety and Dr. Smith did not diagnose Plaintiff with either impairment after evaluating him.  Based on the record, the Court finds substantial evidence to support the ALJ's determination that Plaintiff does not have disabling depression or anxiety.

Plaintiff's subjective complaints are also inconsistent with evidence regarding his daily activities.  In a Function Report dated January 23, 2007, Plaintiff reported that he was able to take his son to school and to care for his son with some help from his mother.  (Tr. 144-151). Plaintiff reported he could take care of most of his personal hygiene needs; could prepare simple meals; could drive; could shop daily for food; and could do household chores "a little at a time." Plaintiff also reported to Dr. Aguilar-Guzman in August of 2006, that he could not take a medication that made him drowsy because he had to take care of his children.  This level of activity contradicts Plaintiff's subjective allegations of disabling pain.

Therefore, although it is clear that Plaintiff suffers with some degree of pain, he has not established that he is unable to engage in any gainful activity.  See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability).  Neither the medical evidence nor the reports concerning his daily activities support Plaintiff's contention of total disability.  Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

-20-

**B.     RFC Assessment:**

We next turn to the ALJ's assessment of Plaintiff's RFC.  RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel,  245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In finding Plaintiff able to perform sedentary work with limitations,  the ALJ considered Plaintiff's subjective complaints, the medical records of his treating and examining physicians, and the evaluations of non-examining medical examiners.  Plaintiff contends the ALJ improperly disregarded Dr. Smith's opinion.

In deciding not to give controlling weight to Dr. Smith's opinion that Plaintiff was seriously limited, but not precluded or unable to meet competitive standards in twenty-five of twenty-five areas of functioning, and that Plaintiff was therefore disabled, the ALJ noted that Dr. Smith's findings were not consistent with the record as a whole.  Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)(the ALJ may reject the conclusions of any medical expert, whether hired by

-21-

the claimant or the government, if they are inconsistent with the record as a whole).  The ALJ also noted that a review of Dr. Smith's assessment and findings indicated that Dr. Smith based a large part of his analysis on Plaintiff's subjective reports of his medical history, including a past history of head trauma, which was otherwise not demonstrated by verifiable medical evidence of record. The ALJ found that because Dr. Smith clearly indicated that his head trauma was part of the basis for his findings, it was only proper for the ALJ not to give full weight to all of Dr. Smith's findings.

As noted by Defendant, courts have affirmed decisions in which one-time examination reports from Dr. Smith were accorded little weight.  See Hudson v. Barnhart, 2005 WL 1560249, *1 (8th Cir. Jul. 6, 2005)("The ALJ gave good reasons for his resolution of the conflict between the mental RFC opinion of Dr. Smith versus those of consulting psychologist Paul Iles and the agency reviewing psychologists").  In Clement v. Barnhart, 2006 WL 1736629 (8th Cir. June 26, 2006), the Eighth Circuit concluded that the ALJ properly discounted the RFC assessment in Dr. Smith's report "after finding it was not supported by his own testing and evaluation, or by other medical evidence in the record, and was inconsistent with Clement's reported daily activities." Id. at *1.  District Courts in the Western District of Arkansas have affirmed the ALJ decisions which accorded little weight to Dr. Smith's opinions.  See Cole v. Astrue, 2009 WL 3158209, *8 (W.D.Ark. Sept. 29, 2009)(held that Dr. Smith's opinion was inconsistent with the remaining medical evidence of record); Partee v. Astrue, 2009 WL 2987398, *1 (W.D. Ark. Sept. 14, 2009)(held that the ALJ clearly recited the evidence of record and why he gave more weight to the findings of Dr. Bunting over that of Dr. Smith); Haarstad v. Astrue, 2009 WL 2324711, *5 (W.D. Ark. July 27, 2009).  The court in Cole also found that the ALJ was not biased against Dr.

-22-

Smith, but merely pointed out the "inconsistencies within Dr. Smith's assessment and the inconsistencies between Dr. Smith's assessment and the other medical evidence of record." 2009 WL 3158209 at *8, n.1.  The undersigned is of the opinion that this is exactly what the ALJ did in the present case.

Furthermore, the ALJ also addressed the RFC assessments of Drs. Williams, Henderson, Crow and Payne, who did not have the benefit of examining Plaintiff but did, unlike Dr. Smith, have the benefit of having Plaintiff's entire medical records before them prior to completing their assessments regarding Plaintiff's capabilities.

Regarding Plaintiff's obesity, the ALJ addressed Plaintiff's obesity individually and in combination to Plaintiff's other alleged impairments.  The ALJ found that the medical evidence did not document that Plaintiff's obesity prevented Plaintiff from sustaining a reasonable walking pace over a sufficient distance or from using his upper extremities effectively to be able to carry out activities of daily living.  While Dr. Bailey opined that Plaintiff's obesity had led to Plaintiff's back problems, Dr. Bailey did not indicate Plaintiff was significantly limited by his obesity. Based on the evidence of record, the Court finds that the ALJ clearly addressed Plaintiff's obesity in connection with his claim for benefits.  Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009)(when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal).  Based on our above discussion of the medical evidence and Plaintiff's activities, the Court finds substantial evidence of record to support the ALJ's RFC determination.

-23-

###### C.      Hypothetical Question to the Vocational Expert:

We now look to the ALJ's determination that Plaintiff could perform substantial gainful employment within the national economy. We find that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.  See Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997); Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996).  Accordingly, the Court finds that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff was not disabled as he was able to perform work as a bench hand assembler, a call out operator/general office clerk, and a surveillance system monitor.  See Pickney, 96 F.3d at 296 (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

###### D.      Fully and Fairly Develop the Record:

Finally, we reject Plaintiff's contention that the ALJ failed to fully and fairly develop the record. While an ALJ is required to develop the record fully and fairly even when a claimant has an attorney, see Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir.2000) (ALJ must order consultative examination only when it is necessary for an informed decision), the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities during the relevant time period. See Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir.2004) (ALJ must develop record fully and fairly to ensure it includes evidence from treating physician, or at least examining physician, addressing impairments at issue).

-24-

**V.**     **Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and thus the decision should be affirmed.  The undersigned further finds that the Plaintiff's Complaint should be dismissed with prejudice.

DATED this 15th day of July 2011.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-25-